UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ANGIE ROBICHAUX PREVOST                CIVIL ACTION NO. 6:17-cv-01364

VERSUS                                 JUDGE TRIMBLE

U.S. COMMISSIONER,                     MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Angie Robichaux Prevost, fully exhausted her administrative

remedies before filing this action in federal court.  She filed an application for

supplemental security income benefits ("SSI"), alleging disability beginning on

April 1, 2012.[1]  Her application was denied.[2]  She then requested a hearing, which

was held on July 8, 2016 before Administrative Law Judge Mary Gattuso.[3]  The ALJ

---

[1]     Rec. Doc. 9-1 at 149.

[2]     Rec. Doc. 9-1 at 90.

[3]     The transcript of the hearing is in the record at Rec. Doc. 9-1 at 41-76.

issued a decision on September 21, 2016, concluding that the claimant had not been disabled within the meaning of the Social Security Act since October 31, 2014 (the date she applied for benefits).[4]   The claimant requested review of the adverse decision, but the Appeals Council found no basis for review.[5]   Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).   The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on September 1, 1978.[6]   At the time of the ALJ's decision, she was thirty-eight years old.   She graduated from high school,[7] and has work experience as a cashier and sales clerk, day care worker, cook in a fried chicken restaurant, home products sales person, and transport driver for an automobile dealership.[8]   She alleged that she has been disabled since April 1, 2012[9] due to

---

[4]      Rec. Doc. 9-1 at 16-30.

[5]      Rec. Doc. 9-1 at 4.

[6]      Rec. Doc. 9-1 at 47.

[7]      Rec. Doc. 9-1 at 62.

[8]      Rec. Doc. 9-1 at 70-71, 158-159, 167.

[9]      Rec. Doc. 9-1 at 149.

degenerative disc disease, bulging discs and back pain, leg and arm pain, numbness in hands and feet, bipolar disorder, anxiety, depression, and migraine headaches.[10]

On January 23, 2013, the claimant saw Dr. Christopher E. Cenac, Jr. at the Houma Orthopedic Clinic[11] regarding neck and right shoulder pain that she attributed to an automobile accident on November 3, 2011, when she reportedly was hit from behind.  She indicated on a diagram of a human body that she had aching pain in her neck, burning pain in her right shoulder, aching pain and numbness in her right hand, as well as burning and aching pain in her low back.  Her chief complaints were back pain and neck and right upper extremity symptoms with numbness into her hands and fingers.  Her low back pain was non-radicular and centered over the lower lumbar spine at the lumbrosacral junction.  Her neck complaints were worse than her back complaints.  Examination revealed that the range of motion in her neck was restricted and there was some tenderness to palpation posteriorly along the cervicothoracic junction.  There were equivocal signs of impingement in the right shoulder.  She had a decreased range of motion in her back but no tenderness or spasm and a negative straight leg raise.  X-rays showed a straightening and slight reversal of the cervical lordosis with some canting along the C5-6 interval as well as a slight increase in lumbar lordosis and some retrolisthesis

---

[10]     Rec. Doc. 9-1 at 77.

[11]     Rec. Doc. 9-1 at 240-243, 257-261.

at L3-4 and L2-3.  Dr. Cenac's assessment was that the MRI of the cervical spine obtained on January 10, 2012 showed cervical disc herniation at C5-6, lumbago, and cervicalgia with right upper extremity radiculopathy.  The claimant had already seen Dr. Awasthi, who had recommended a C5-6 anterior cervical discectomy and fusion. Dr. Cenac concurred in the surgical recommendation and felt she would have a good result and be at maximum medical improvement six months after surgery.

The claimant returned to see Dr. Cenac on April 3, 2013, after deciding to treat with him rather than Dr. Awasthi.  Dr. Cenac recommended getting another cervical MRI and cervical epidural steroid injections before proceeding with cervical artificial disc replacement surgery.

On April 12, 2013, the claimant saw Dr. Michael S. Haydel, a pain management specialist and anesthesiologist.[12]  She complained of pain that she related to the 2011 motor vehicle accident.  She described a constant shooting and cramping pain with numbness, tingling, and burning sensation in her neck, shoulder/upper extremity, and thoracic spine.  She associated her pain with headaches, weakness, depression, and an inability to sleep.  She reported that her symptoms worsened with standing, walking, driving, and bending forward at the neck or waist.  She reported previous occupational therapy, physical therapy,

---

[12]    Rec. Doc. 9-1 at 280-281.

chiropractic care, and use of a TENS unit, all of which she claimed were not helpful. Dr. Haydel noted that a cervical MRI from January 2012 showed a C5-6 dorsal disc bulge lateralizing to the right and a C4-5 dorsal disc bulge with compression of the thecal sac. The claimant did not report prior treatment with medication. But she was then taking Klonopin, Soma, Prozac, Lortab, Loratadine, Seroquel, Clonidine, Fioricet, Trazodone, Topamax, Folic Acid, a multivitamin, and Benadryl. She indicated a history of headaches, back pain, neck pain, muscle pain, depression, suicidal ideation, mental problems, loss of balance, muscle weakness, numbness, tingling, arthritis, and anxiety. She was 5'6" and weighed 250 pounds. Dr. Haydel's impression was cervicalgia and right upper extremity radicular pain with multilevel disc protrusions; history of a suicide attempt by overdose in February 2012; as well as depression, anxiety, insomnia, and arthritis. His plan was to proceed with cervical epidural steroid injections.

The claimant returned to see Dr. Cenac on June 12, 2013 and July 24, 2013.[13] She was still symptomatic, surgery was discussed, and she wanted to proceed with surgery. Dr. Cenac planned to seek workers comp approval for the surgery.

The claimant again saw Dr. Cenac on October 11, 2013.[14] She remained symptomatic. Physical examination showed limited range of motion in the cervical

---

[13]    Rec. Doc. 9-1 at 255.

[14]    Rec. Doc. 9-1 at 254.

spine and positive Hoffman's sign bilaterally.  Dr. Cenac stated that her symptoms were greater on the right side.  He felt she was a candidate for cervical artificial disc versus cervical fusion surgery.  Risks, benefits, and complications of both procedures were discussed.  The claimant wished to proceed, but workers comp approval had not yet been obtained.  The claimant followed up with Dr. Cenac on November 18, 2013.[15]  By that time, she had been approved for surgery.

On December 10, 2013,[16] Dr. Cenac performed a C5-6 anterior cervical discectomy and fusion with placement of instrumentation, cage placement, use of iliac crest aspirate, and use of interbody spacer.

The claimant followed up with Dr. Cenac on December 18, 2013.[17]  She had no complaints of neck pain or radicular symptoms down her arm but her shoulder symptoms remained and were increasing.  On physical examination, Dr. Cenac observed significant signs of impingement in her right shoulder.  X-rays showed excellent consolidation of the interbody grafts, no change in the alignment, and no signs of loosening.  He recommended a right shoulder subacromial injection and/or a Medrol Dosepak.

---

[15]     Rec. Doc. 9-1 at 252.

[16]     Rec. Doc. 9-1 at 248-251.

[17]     Rec. Doc. 9-1 at 247.

The claimant saw Dr. Cenac again on January 2, 2014.[18]  She complained of intense muscle spasms in her neck, and a moderate amount of spasm was noted in the bilateral trapezius muscles.  X-rays showed a lack of lordosis and excellent placement of the hardware.  She was given Soma, a muscle relaxer, and instructed to continue taking her pain medication.  Dr. Cenac did not refill her Klonopin, as she was to see Dr. Patrick Walker in that regard.  Physical therapy was prescribed.

The claimant again followed up with Dr. Cenac on January 27, 2014.[19]  She complained of pain across the cervical spine but no radiculopathy and was "overall much improved."  She was to continue physical therapy.

The claimant returned to Dr. Cenac on March 26, 2014.[20]  She was still having some chronic posterior neck pain.  She had a limited range of motion and tenderness to palpation posteriorly.  However, x-rays showed excellent consolidation of the interbody fusion, alignment was maintained, and no gross changes overall.  Dr. Cenac's assessment was C5-6 anterior cervical fusion with chronic pain.  His plan was to prescribe a neurogenic cream for posterior muscle spasm, prescribe a different muscle relaxer, and recommend the use of a heating pad.  He also prescribed continued physical therapy.

---

[18]     Rec. Doc. 9-1 at 237, 246, 279.

[19]     Rec. Doc. 9-1 at 246.

[20]     Rec. Doc. 9-1 at 245, 271.

On April 9, 2014, the claimant called Dr. Cenac's office stating that she was having pain all over, including back pain and numb toes, and seeking medication for pain relief.[21]  A prescription for Norco was called in.[22]

The claimant saw Dr. Patrick D. Walker on April 23, 2014 in follow up.[23]  She wanted to change her pain medication.  She complained of low back pain, excessive worrying that interfered with her daily functioning, depressive mood symptoms including loss of interest or pleasure in most activities, sadness, and feeling down, associated with anxiety and restlessness, insomnia, low energy level, and negativistic thinking.  She was taking Prozac, Trazodone, and Norco as well as Topamax, Klonopin, Seroquel, Fioricet, and Soma prescribed by Dr. Cenac.  Dr. Walker's assessment was depressive disorder, anxiety state, degeneration of cervical intervertebral discs, insomnia, migraine, and lumbago.  He refilled her Seroquel and Prozac, which he indicated are to treat the depression; he refilled her Klonopin, which he indicated was to treat her anxiety; and he refilled her Topamax and Fioricet, which he indicated were to treat her migraine headaches.

On May 6, 2014, Dr. Cenac added Anaprox to the claimant's prescriptions.[24]

---

[21]    Rec. Doc. 9-1 at 269.

[22]    Rec. Doc. 9-1 at 268.

[23]    Rec. Doc. 9-1 at 216-217.

[24]    Rec. Doc. 9-1 at 265.

The next day, the claimant saw Dr. Cenac.[25]  She was continuing to complain of pain, stated that she does not have pain every day, and stated that the pain increases with activity.  Physical examination revealed a slightly limited range of motion.  X-rays showed an excellent consolidation of the interbody fusion, hardware in good alignment, and no adjacent segment issues.  Dr. Cenac changed her pain medication to a Duragesic patch, recommended a functional capacity evaluation, and noted that her lumbar issues complicated her picture.

The claimant also visited Dr. Walker that same day.[26]  She complained of painful red swollen bumps under her right and left arms and denied all other complaints.  She was diagnosed with hidradenitis and prescribed medications to treat that condition.  Dr. Walker also started her on a Neurontin capsule.

An MRI of the claimant's lumbar spine, obtained on May 12, 2014,[27] showed mild degenerative disc disease at L4-5 and L5-S1 with bilateral foraminal encroachment but no central canal stenosis at any level.  There had been no significant change since October 2010.

---

[25]    Rec. Doc. 9-1 at 244, 289.

[26]    Rec. Doc. 9-1 at 218-219.

[27]    Rec. Doc. 9-1 at 308-310, 313-314.

The claimant sought treatment at the Teche Action Clinic in Dulac, Louisiana, on June 3, 2014 for back pain and saw a nurse practitioner, Stacey Molinere.[28]  The claimant reported that she was currently taking twenty-three prescription medications.  She said she felt depressed or hopeless, nervous, and worried.  She reported an increase in substance usage.  The nurse found paraspinal tenderness and a restricted range of motion in the lumbar spine due to pain but the lumbar spine was stable.  The nurse also noted that the claimant had "medicated judgment" but good insight.  The assigned diagnoses were unspecified backache, bipolar disorder, morbid obesity, and opioid type dependence.  The claimant was referred to the Tulane Medical Center's orthopedics clinic.[29]  On June 10, 2014,[30] Nurse Molinere referred the claimant for a sleep study, and on June 20, 2014,[31] Nurse Molinere referred the claimant to a neurologist due to numbness in her toes.

On July 21, 2014, the claimant was seen by nurse practitioner Pamela Dupont at Psychiatric Services, LLC in Gray, Louisiana,[32] for an initial psychiatric evaluation.  The claimant reported that she had slept very poorly over the past six

---

[28]      Rec. Doc. 9-1 at 394-397.

[29]      Rec. Doc. 9-1 at 388-393.

[30]      Rec. Doc. 9-1 at 385-387.

[31]      Rec. Doc. 9-1 at 383-384.

[32]      Rec. Doc. 9-1 at 229-230, 316-318.  Portions of the treatment record are missing, with paragraphs at the bottom of at least one page cut off.

months and only for about four to five hours per night but napped frequently during the day.  She said she felt depressed on most days with some episodes of severe sadness.  She stated that she was irritable and had withdrawn from social contacts.  She reported that she spent her days alone, coloring with crayons.  She stated that she was unable to concentrate and failed to complete tasks.  She reported mood swings and racing thoughts.  She voiced complaints of body pain such as back and neck pain, and she complained of severe panic attacks multiple times per week accompanied by shortness of breath, chest pain, and feelings of doom.  She denied suicidal and homicidal ideation but stated that she felt worthless and hopeless since an emotionally and physically abusive past relationship had resulted in a suicide attempt.  She denied paranoia but stated that people blamed her for things she had not done.   She admitted to sometimes having auditory, visual, and tactile hallucinations, including seeing things in the corner of her eyes and feeling something moving next to her skin.  She was reportedly treated at Chabert Medical Center for her suicide attempt after overdosing on Klonopin following an argument with her boyfriend.  She reported that she was diagnosed, at that time, with Bipolar Mood Disorder, most recent depressed.  She had no medical follow-up but did have some counseling.  She formerly treated with Dr. Patrick Walker, but was seeking a primary care physician.  She gave a history of childhood asthma, degenerative disc disease, arthritis, hand surgery following a motor vehicle accident, cervical fusion,

11

appendectomy, benign ovarian cyst removal, tonsillectomy, two exploratory abdominal surgeries, and fundoplacation.  She stated that she needs a sleep study, has daily headaches, and recently was taking Adipex for weight loss.  She reported that she was taking the following medications:    Clonazepam for anxiety; Carisoprodol (for muscle pain); Famotidine (also known as Pepcid for stomach complaints); Fluoxetime (for depression); Topeamate (for headaches); Gabapentin (for neuropathic pain), Naproxen (for moderate pain), folic acid, Lortab (for pain); lactulose (for constipation); Seroquel (which treats mood disorders), and a Butrans patch (which delivers opioid pain medication through the skin).  As needed, she was also taking Trazodone (for depression and anxiety disorders), Butalbital (for tension headaches), Fioricet (for tension headaches), Ropinirole (for restless leg syndrome), Clonidine (for high blood pressure), Zolpidem (also known as Ambien, which treats insomnia), Meclizine for balance, Ibuprofen for inflammation, Zofraon for nausea, Promethazine Phergan for nausea; and Fluticasone nasal spray.

The claimant reported that she was sexually abused by her older brother, did not get along with her mother growing up, went through counseling for sexual trauma, was married for twelve years before being divorced when her son was two years old, and currently lived with her boyfriend who was using methamphetamines. The claimant was alert and oriented but was noted to have fair hygiene and a disheveled appearance.  Her speech was rapid and pressured.  She ruminated about

her physical pain and how many medications she was taking.  Her mood was depressed and sad and she reported being irritable most days.  Her affect was congruent, and her behavior was cooperative but anxious.  It was noted that she lacked insight into physical problems caused by her obesity and displayed much somatization of physical complaints and polypharmacy (the simultaneous use of multiple drugs to treat a single ailment or condition).  She denied suicidal and homicidal ideation, admitted to feelings of worthlessness and hopelessness, and had persecutory delusions.

Nurse Dupont noted the prior diagnosis of bipolar depression and added diagnoses of somatic delusion disorder and morbid obesity.  The plan was to start to titrate Lamictal for mood stabilizer and to wean the claimant off most medications as quickly as possible.  Nurse Dupont also referred the claimant to the Center for Positive Change for lifestyle change counseling.  The record contains no indication that the claimant followed up on that referral.

The claimant returned to see Nurse Dupont on August 5, 2014.[33]  She reported chronic pain and polypharmacy.  She was alert, oriented, casually but neatly dressed with good hygiene.  Her speech was within normal limits, her thought process was linear, her mood was depressed, her affect was irritable, and she was anxious.  She

---

[33]      Rec. Doc. 9-1 at 228.

reported sleeping only a few hours per night and feeling hopeless and worthless. She denied suicidal ideation, homicidal ideation, paranoia, and hallucinations. She reported that she colors all day long to "zone out." She reported that her boyfriend was becoming more distant and she suspected him of cheating, which resulted in her being very upset. She reported that a sleep study indicated that she needs a C-pap machine. She stated that all she does is cry. Her medications were Klonopin, Lamictal, Seroquel, and Topamax.

On August 8, 2014, the claimant was seen by Dr. Troy Beaucoudray at Advanced Neurodiagnostic Center in Metairie, Louisiana.[34]   She told Dr. Beaucoudray that her neck and low back pain began in her late teenage years and slowly progressed. She claimed that a motor vehicle accident in 2011 resulted in a whiplash type injury that caused significant neck pain as well as tingling down her arms. She stated that physical therapy provided no benefit and that the cervical fusion surgery in 2013 provided only moderate benefit. Her main complaint was low back pain, and she presented an MRI showing bulging discs at L4-5 and L5-S1. She rated her cervical pain at 6/10 and her low back pain at 8/10 with radiation to her bilateral lower extremities. She reported that she has been utilizing intermittent dosing with hydrocodone from her previous physician. She stated that without pain

---

[34]     Rec. Doc. 9-1 at 302-307.

medication her low back pain prevents her from any form of gainful activities.  She was alert, oriented, and cooperative.  Upon examination, she had normal muscle tone and normal strength in all muscles except with right dorsiflexion.  She had subjective tingling in both legs and decreased perception of light touch to her big toes.  Her gait was antalgic.  Dr. Beaucoudray found tenderness to palpation and spasm in the bilateral cervical paraspinals and restricted range of motion in the cervical spine.  He also noted tenderness to palpation and spasm of the bilateral lumbar paraspinals and a restricted range of motion in the lumbar area on extension and bilateral rotation. She reported that she was taking twelve prescription medications.

On August 26, 2014, Dr. Beaucoudray noted an abnormal nerve conduction study, showing findings consistent with right lumbrosacral radiculopathy at L4-S1.[35]

On September 10, 2014, the claimant again saw Dr. Beaucoudray.[36]  He noted that, at the previous visit, he had ordered diagnostic testing, continued the claimant's Norco, and started her on Parafon forte.  He stated that her problems were tingling in her extremities; muscle spasms; lumbar radiculopathy; and postlaminectomy syndrome, cervical.  His review of the claimant's musculoskeletal system found neck pain, back pain, joint pain, muscle spasms, and muscle weakness.  His neurological examination found numbness, paresthesia, and radicular pain and

---

[35]    Rec. Doc. 9-1 at 294.

[36]    Rec. Doc. 9-1 at 296-297.

tingling.  He also noted anxiety, depression, and insomnia.  He prescribed Norco for the postlaminectomy syndrome, prescribed Ibuprofen and Gabapentin for the lumbar radiculopathy, and prescribed Parafon forte for muscle spasms.  He counseled the claimant regarding stretching and strengthening exercises, the appropriate use of medications, and stated that he would send her for a toxicology screen to ensure medication compliance.

The claimant returned to see Nurse Dupont on September 2, 2014.[37]  She reported that she had been hospitalized for double pneumonia and needed a C-pap machine.  She also reported that she was very fatigued and needed oxygen at night.  Her boyfriend was not working, and her birthday had been very disappointing.  Her mood was depressed, and she reported crying daily.  Her affect was angry, and her behavior exhibited loss of motivation.  She stated that she was not getting along with her boyfriend because of money, and she also stated that he was critical of her because of her depression.  She reported that he was using meth, not carrying through with his promises, and unable to make decisions.  She reported that she was back on Adipex for weight loss.  She had somatic complaints about her back and headaches.  Nurse Dupont increased her Topomax and Prozac dosages, stopped the Seroquel, and added Abilify.

---

[37]    Rec. Doc. 9-1 at 225.

At the time of her application for benefits in October 2014, the claimant was taking eleven prescription medications:  a new medication for her bipolar condition that replaced the Seroquel she had previously taken, Gabapentin for nerve pain, Ibuprofen 800 for pain, Klonopin and Lamictal for mental illness, Norco for pain, Parafon as a muscle relaxer, Pepcid for stomach problems, Prozac for anxiety and depression, Topamax for migraine headaches, and Vistaril for anxiety.[38]

The claimant again saw Nurse Dupont on November 10, 2014.[39]  She reported that she stopped taking Abilify when she ran out of samples.  She stated that she was very irritable, moody, and crying a lot.  She also said her sleep was poor.  She reported that her boyfriend was on drugs but had no insurance so could not go to rehab.  She denied suicidal and homicidal ideation but reported seeing shadows in the corner of her eye, had persecutory delusions, and complained of somatic pain over her body, especially chronic back pain.  She reported losing forty pounds.  The diagnoses assigned were Bipolar I disorder, most recent episode depressed, moderate; somatic delusion disorder, morbid obesity, and chronic anxiety.  Nurse Dupont's plan was to continue to wean the claimant off some of her medications.  But she was to continue taking Klonipin, Lamictal, and Topamax and to add Vistaril if needed for anxiety.

---

[38]    Rec. Doc. 9-1 at 169.

[39]    Rec. Doc. 9-1 at 225-226.

In her function report, dated January 16, 2015,[40] the claimant stated that was unable to lift heavy objects or to stand or sit for long periods of time. She stated that she did not do household chores of any kind due to pain and because she found it stressful. However, she did prepare simple meals for her son when she could. She prepared sandwiches for herself weekly. She also cared for pets with assistance from her son and her mother. She said that she shopped for personal hygiene items and food every other week or so, depending on her pain level. Her interests included reading, watching TV, coloring, walking, and playing with her son. She stated that she could no longer play sports with her son or walk long distances. She stated that she did not go anywhere on a regular basis and did not take part in activities because she would rather stay by herself. However, she did talk on the phone and visit friends once per day. She explained that she followed spoken instructions better than written instructions, got along with authority figures, and did not handle stress or changes in routine very well.

The claimant was seen at the Teche Action Clinic in Houma, Louisiana, on March 12, 2015 as a new patient for nurse practitioner Jennifer Millet.[41] She was advised that the clinic did not treat chronic pain and would have to find another provider for pain management treatment. Her primary complaint was left foot pain,

---

[40]     Rec. Doc. 9-1 at 182-189.

[41]     Rec. Doc. 9-1 at 375-382.

rated at 5 to 6 on a ten-point scale.  Her gait was normal, there was no tenderness to palpation, she had normal range of motion, as well as normal tone, bulk, and strength.  Her mood and affect were appropriate.  She was given injections of Depo Medrol and Toradol.

The claimant returned to Nurse Dupont on March 20, 2015.[42]  She reported that she had a new boyfriend, her mood had improved, and she had had only one really bad panic attack since her last appointment.  She reported improved sleep and eating habits and was no longer feeling worthless or hopeless.  Nurse Dupont assigned a GAF score of 75, indicating only a slight impairment in functioning.[43]

The claimant again saw Nurse Dupont on May 1, 2015.[44]  She reported continued sobriety from opiates.  She complained of dizziness, nystagmus, and

---

[42]    Rec. Doc. 9-1 at 319-321.

[43]    The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the range of 71 to 80 indicates transient symptoms or expected reactions to stressors resulting in no more than a slight impairment in social, occupational, or school functioning.  The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).  However, GAF scores continue to be considered evidence.  "We consider a GAF rating as opinion evidence. As with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise."  *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *8 (N.D. Tex. Nov. 5, 2015) (Administrative Message 13066 attached as an exhibit to the opinion).

[44]    Rec. Doc. 9-1 at 322-324.

difficulty walking, and her Topamax was discontinued.  Since her last appointment, she had reportedly broken up with two boyfriends and was living with a third.  Nurse Dupont's assessments were bipolar mood, borderline personality, obesity, and poor relationships.

On August 3, 2015, the claimant saw licensed professional counselor Angela Bramande at South Central Louisiana Human Services Authority.[45]  She reported that she had stopped seeing Nurse Dupont about five months earlier when her medication made her dizzy and she could no longer drive.  She also reported that her fiancé had died in June.  She was seeking treatment for depression and reported that she cried all the time.  Her affect was appropriate, she denied homicidal and suicidal ideation, her mood was anxious and depressed, and her thought process was intact. She admitted her suicide attempt in 2011.[46]  The assessment was depressive disorder.

On August 18, 2015, the clamant saw licensed clinical social worker Deanie Soignier at the South Central Louisiana Human Services Authority,[47] stating that she had been off her medication for six to seven months.  Her mood was depressed, her affect and mood were congruent, and she reported drinking and smoking cigarettes

---

[45]    Rec. Doc. 9-1 at 342-347.

[46]    It appears that she only attempted suicide once, although the date is sometimes stated as 2011 and sometimes stated as 2012.

[47]    Rec. Doc. 9-1 at 339-341.

more lately.  She was not interested in counseling services but was interested in medication for her depression.  The assessment was depressive disorder, rule out alcohol abuse.

On August 25, 2015, the claimant saw Nurse Millet again.[48]  Her chief complaints were sinus problems, chronic back pain, and a desire to restart bipolar medications.  She was given a Depo Medrol injection and counseled on tobacco cessation.  She stated that her problems do not affect her normal activities, and Nurse Millet noted that she had no functional impairment.  She was prescribed Baclofen for pain; Fluticasone spray for her sinuses; Ibuprofen 800 for pain; Loratadine as needed for congestion; Meclizine as needed for dizziness; Topamax for headaches; Vistaril as need for anxiety or sleep, Wellbutrin XL for depression; and Zithromax.

The claimant saw Dr. Daren Parsa at South Central Louisiana Human Services Authority on October 14, 2015 for a new psychological evaluation.[49]  She reported a long history of depression and anxiety with low energy, low motivation, difficulty sleeping, erratic appetite, and occasional difficulty concentrating.  She reported one suicide attempt by overdose in 2011 and denied any suicidal or homicidal ideation since then.  She reported no hallucinations or delusions and no history of manic episodes.  She had been started on Wellbutrin and Hydroxyzine in August but

---

[48]    Rec. Doc. 9-1 at 366-374.

[49]    Rec. Doc. 9-1 at 337-339.

reported a lack of benefit from both medications.  She reported stress due to her fiancé's death in June.  She reported that she was living with her boyfriend at her father's home, was not employed, had been divorced for seven or eight years, had an eleven-year-old son who lived with her every other weekend and in the summer. She reported occasional headaches, back pain, and neck pain.  Her affect was constricted, her attitude was cooperative, her insight and judgment were fair, her mood was depressed and anxious, her thought content was unremarkable, her thought process was intact, and her memory was good.  No formal testing of her concentration was performed.  The doctor's assessment was major depressive disorder, recurrent.  The treatment plan was to stop BuPropion and Hydroxyzine Pamoate for lack of benefit, start Effexor XR for depression, and start Mirtazapine for insomnia and depression.  The claimant did not want to schedule counseling.

On December 18, 2015, the claimant returned to see Dr. Parsa.[50]  She reported that the Effexor XR was ineffective and reported that she stopped taking Mirtazapine after two weeks because it was ineffective.  The diagnosis remained the same.  A different form of Effexor was prescribed.

The claimant again saw Nurse Millet on January 12, 2016.[51]  She was diagnosed with allergic rhinitis and an acute upper respiratory infection.  She was

---

[50]    Rec. Doc. 9-1 at 334-336.

[51]    Rec. Doc. 9-1 at 354-364.

given a Depo Medrol injection.   Nasonex and Singulair were added to her medications.   Upon examination, Nurse Millet found paraspinal tenderness to palpation but a normal range of motion in both the cervical spine and lumbar spine as well as a positive straight less raise test.   She encouraged the claimant to exercise four to six times per week for thirty-five to forty-five minutes.   She also referred the claimant to Dr. Seely at Tulane for chronic low back and neck pain.

On the same day, January 12, 2016, Nurse Millet filled out a form[52] indicating that she had asked the claimant if she experienced certain symptoms upon protracted standing and walking and upon protracted sitting, and the claimant stated that she had low back pain, sciatica, neuropathy pain in her feet, and pain the right knee after protracted standing or walking and low back pain, sciatica, and exacerbation of cervical pain after protracted sitting.   Nurse Millet declined to answer the questions regarding the claimant's functionality over the course of a work day.

On March 14, 2016, the claimant again saw Dr. Parsa.[53]   She reported some improvement of mood and anxiety with her new medication but continued to complain of low energy, difficulty concentrating, and intermittent sleep difficulty. Her then-current medications were Baclofen, Topiramate (also known as Topomax), Ibuprofen, Folic acid, Effexor XR, and Fioricet.   He started her on Vistaril for

---

[52]      Rec. Doc. 9-1 at 326.

[53]      Rec. Doc. 9-1 at 331-333.

anxiety.  Dr. Parsa noted that the claimant was well groomed, her affect was appropriate, her attitude was cooperative, her insight and judgment were fair, her mood was depressed and anxious (but improved with medication), her thought content was unremarkable, her thought process was intact, and no testing of her ability to concentrate was performed.

That same day, March 14, 2016,[54] Dr. Parsa filled out a form indicating that the claimant had a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  He noted that she did not have thoughts of suicide, hallucinations, delusions, or paranoid thinking.  He also noted that she did not have bipolar syndrome.  Dr. Parsa indicated that the claimant had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; and marked deficiencies in maintaining concentration, persistence, or pace.  He also indicated that she had experienced four or more episodes of decompensation, each of extended duration.  Further, Dr. Parsa noted that the claimant had a documented history of a chronic affective disorder of at least two years' duration that caused more than a minimal limitation of ability to

---

[54]    Rec. Doc. 9-1 at 328-329.

do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and with a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. Finally, he noted that she had a substantial loss of ability to understand, carry out, or remember simple instructions; make judgments that are commensurate with the functions of unskilled work; respond appropriately to supervision, coworkers, or usual work situations; and to deal with changes in routine work settings.

On May 24, 2016, Dr. Parsa wrote a letter, in which he stated that the claimant was being treated for major depression and anxiety and "is unable to engage in gainful employment as she has had multiple depressive symptoms including insomnia, low energy and difficulty concentrating."[55]

On July 8, 2016, the claimant testified at a hearing regarding her symptoms and her medical treatment. She stated that she injured her cervical spine in an automobile accident and underwent fusion surgery. Since that time, however, she had continued to experience occasional pain in her neck as well as tingling and numbness that went down her arm to her right hand. She stated that writing for more than about ten minutes caused her hand to cramp up. She said that she had trouble

---

[55]      Rec. Doc. 9-1 at 399.

driving because she did not have a full range of motion in her neck.  She also complained of headaches that she related to her neck injury and stated that her neck was "still not like it was before the wreck."

She also testified that she was treating with Dr. Beaucoudray for lumbar pain. She stated that her back pain went down both legs, accompanied by a tingling sensation.  She testified that she could only sit for about ten or fifteen minutes without having to stand up, and she did stand up during the hearing.

The claimant stated that she had had mental health issues since she was a teenager, which progressively worsened.  She said that she stayed in bed most of the time, sometimes reading, watching TV, or coloring (although coloring was reportedly difficult due to the tingling and numbness in her right hand).  She stated that she had trouble sleeping – both due to the pain and because her mind would not shut off.  She stated that she had no energy, did not feel good about herself, and attempted suicide a few years ago.  She stated that she had only one friend.  She stated that her poor memory impaired her job performance in the past, stated that she stayed to herself rather than trying to get along with other employees, and stated that she is "not good at change."  She said that she gets scared, nervous, and freaked out when she leaves the house.  She explained that she was seeing a mental health counselor at her home once each week and seeing Dr. Parsa every two to three

26

months.  She stated that she drives a few times a week, mostly to pick her eleven

year old son up from his father.  She denied doing any housework.

The claimant explained that she had frequent panic attacks.  Although they

formerly occurred approximately every other day and lasted for twenty to forty

minutes, the frequency had been reduced to about once every two weeks.

At the time of the hearing, the claimant stated that she was not taking any

medication.

The claimant seeks reversal of the Commissioner's adverse decision.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited

to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[56]  "Substantial evidence

is more than a scintilla, less than a preponderance, and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."[57]  Substantial

evidence "must do more than create a suspicion of the existence of the fact to be

---

[56]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173
(5th Cir. 1995).

[57]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[58]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[59]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[60]  Conflicts in the evidence[61] and credibility assessments[62] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[63]

---

[58]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[59]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[60]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[61]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[62]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[63]    *Wren v. Sullivan*, 925 F.2d at 126.

28

B.    ENTITLEMENT TO BENEFITS

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[64]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[65]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[66]

C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This requires the ALJ to determine whether the claimant (1) is

---

[64]      42 U.S.C. § 1382(a)(1) & (2).

[65]      42 U.S.C. § 1382c(a)(3)(A).

[66]      42 U.S.C. § 1382c(a)(3)(B).

29

currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[67]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[68] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[69]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[70]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[71]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[72]  If the Commissioner

---

[67]     20 C.F.R. § 404.1520.

[68]     20 C.F.R. § 404.1520(a)(4).

[69]     20 C.F.R. § 404.1545(a)(1).

[70]     20 C.F.R. § 404.1520(e).

[71]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[72]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[73]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[74]

### D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since October 31, 2014.[75]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  spinal disorders, obesity, and affective and anxiety disorders.[76]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[77]  The claimant challenges this finding.

---

[73]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[74]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[75]    Rec. Doc. 9-1 at 18.

[76]    Rec. Doc. 9-1 at 18.

[77]    Rec. Doc. 9-1 at 19.

The ALJ found that the claimant has the residual functional capacity to perform light work except for the following:[78]  she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, crouch, kneel, and crawl; she cannot work with moving or dangerous machinery; she cannot work at unprotected heights; she cannot engage in commercial driving.  She is limited to unskilled work that involves routine, repetitive tasks.  She must have only occasional direct interaction with the public, she should generally work with things rather than people.  She can have occasional interaction with coworkers and supervisors.  She should not do work that involves strict production quotas.  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work as a daycare worker.[79]  The claimant does not challenge this finding.

At step five, the ALJ found that the claimant has not been disabled since October 31, 2014, the date on which her application for benefits was filed, because there are jobs in the national economy that she can perform.[80]  The claimant challenges this finding.

---

[78]     Rec. Doc. 9-1 at 21.

[79]     Rec. Doc. 9-1 at 29.

[80]     Rec. Doc. 9-1 at 30.

### E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in failing to develop the record regarding the claimant's physical impairments; and (2) in failing to give controlling weight to the opinions of the claimant's treating physician.

### F.    THE ALJ DID NOT FAIL TO DEVELOP THE RECORD

The claimant argued that the Commissioner's decision is not based on substantial evidence because the ALJ failed to develop the record by not obtaining a consultative examination by a physician who was not a psychologist. She argued that the ALJ should have obtained a functional analysis from a physician other than a psychologist who could have opined about the functional limitations resulting from the claimant's neck and low back conditions.

An ALJ has a duty to develop the record fully and fairly to ensure that his or her decision is informed and based on sufficient facts.[81]  An ALJ's decision will be reversed or remanded by a court if the claimant establishes, first, that the ALJ failed to fulfill her duty to adequately develop the record; and, second, that the claimant was prejudiced by that failure.[82]  To establish prejudice, a claimant must demonstrate

---

[81]    *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).

[82]    *Brock v. Chater*, 84 F.3d at 728.

that he "could and would have adduced evidence that might have altered the result."[83]

Despite the ALJ's duty to develop the record, an examination by a consulting physician at government expense is not required unless the record establishes that the ALJ is unable to make a disability decision without such an examination.[84] Thus, the obligation to develop the record exists only when the evidence in the record is ambiguous or inadequate. Whether such an examination is necessary is within the ALJ's discretion.[85]

In this case, the record contained adequate evidence to permit the ALJ to make a disability decision supported by substantive evidence concerning the effect of the claimant's neck and back conditions on her functionality. The ALJ evaluated the treatment notes from the physicians who treated the claimant's neck and back problems, found that those problems are severe, and found that the functional impairments resulting from these conditions support a residual functional capacity for light work with certain additional restrictions.

---

[83]    *Kane v. Heckler*, 731 F.2d at 1220.

[84]    *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting J*ones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987)).

[85]    *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989).

The claimant's cervical condition originated with a motor vehicle accident, was treated conservatively for some time, and was then addressed surgically.  It is not clear from the record whether the claimant's low back condition was also caused by the motor vehicle accident, and it was only treated conservatively.  The record contains no indication that any of the doctors who treated the claimant for her neck and back complaints placed any limits or restrictions on her activities at any time.  When the claimant was treating with Nurse Millet, it was suggested that she increase her activity level with exercise on most days.

The plaintiff's primary complaint with regard to both her neck and back was that she experienced pain.  But not all pain is disabling, and a claimant who is unable to work without some pain or discomfort is not automatically disabled.  Pain constitutes a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[86]  Pain may also constitute a non-exertional impairment that limits the range of jobs a claimant would otherwise be able to perform.[87]

When the claimant first saw Dr. Cenac, her neck pain was reportedly worse than her low back pain.  The MRI of the claimant's lumbar spine from May 2014

---

[86]     *Chambliss v.* Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

[87]     *Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994) (citing *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983)).

indicated mild degenerative disc disease, but right lumbrosacral radiculopathy was later confirmed with diagnostic testing.  The claimant was twice referred to the orthopedics clinic at Tulane, but the record contains only one reference to her possibly having seen a physician there, and it stated that her MRI showed mild degenerative disc disease and mild foraminal narrowing; it further stated that the claimant was not a surgical candidate.[88]

At the hearing, the plaintiff stated that she was planning to again see Dr. Beaucoudray for her back, but according to the treatment notes in the record, she had not seen him in approximately two years.  She stated that she stopped treating with him for mental reasons.  At the time of the hearing, she was not taking any medication at all despite having previously taken a wide assortment of muscle relaxers and pain killers (including opioids) prescribed on the basis of her subjective pain complaints.  A claimant's lack of need for strong medication and a claimant's failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount a claimant's complaints of disabling pain or other limitations.[89]

---

[88]     An undated handwritten note on Tulane Spine Center letterhead was included in Dr. Beaucoudray's records.  (Rec. Doc. 9-1 at 309).

[89]     *Austin v. Apfel*, 205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991)).  See, also, *Clayborne v. Astrue*, 260 Fed. App'x 735, 737 (5th Cir. 2008); *Doss v. Barnhart*, 137 Fed. App'x 689, 690 (5th Cir. 2005); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

While the ALJ has a duty to fully and fairly develop the record, the claimant has a duty to submit evidence of disability, which includes a duty to obtain medical records.[90]  In this case, the claimant did not submit medical records from the Tulane Spine Clinic other than a single handwritten note, nor did she submit records evidencing recent treatment of her neck and back conditions, nor did she obtain a functional analysis from a treating physician or from an independent medical source. Before the ALJ's decision was rendered, she did not request that the ALJ obtain a consulting examination.  In sum, the medical evidence that was submitted by the claimant failed to establish that her neck and back conditions were disabling.

The claimant did not show that the ALJ's failure to obtain an examination by a consulting physician resulted in prejudice.  "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision."[91]  In other words, the claimant must show that she "could and would have adduced evidence that might have altered the result."[92]  The claimant suggested that

---

[90]     *Gonzalez v. Barnhart*, 51 Fed. App'x 484, 484 (5th Cir. 2002) (citing *Thorton v. Schweiker*, 663 F.2d 1312, 1316 (5th Cir. 1981) ("We, of course, do not hold that the Social Security Administration is responsible for securing evidence of disability for a claimant.  That duty is clearly on the claimant.")).

[91]     *Ripley v. Chater*, 67 F.3d 552, 557, n. 22 (5th Cir. 1995).

[92]     *Brock v. Chater*, 84 F.3d at 728-29 (quoting *Kane v. Heckler*, 731 F.2d at 1220).

the state agency examiner did not have all pertinent treatment records when he evaluated the claimant's impairments, but the ALJ's decision was not limited to the evidence reviewed by the state agency examiner.   The claimant referenced no evidence other than that already in the record and reviewed by the ALJ to support her contention that her neck and back conditions were more severe than found by the ALJ.  Therefore, the claimant failed to show that she was prejudiced by the ALJ's failure to obtain a consultative examination.

"A consultative examination may be necessary to develop a full and fair record.  However, the decision to require such an examination is within the discretion of the ALJ."[93]  This Court finds no basis for concluding that, in this case, the ALJ's decision not to request a consultative examination was an abuse of discretion.  Since there was sufficient evidence in the record for the ALJ to make a disability determination, the ALJ had no obligation to order any further consultative examination.[94]  This Court also finds that the ALJ's decision that the claimant's neck and back conditions are not disabling was reached by employing the proper legal standards and is supported by substantial evidence in the record.

---

[93]     *Wren v. Sullivan*, 925 F.2d at 128.  See, also, *Jones v. Bowen*, 829 F.2d at 526.

[94]     See *Jones v. Astrue*, 691 F.3d 730, 733–34 (5th Cir. 2012) (the ALJ did not have obligation to further develop the record where ample medical records were available from which the ALJ could determine disability).

### G.    THE ALJ DID NOT ERR IN FAILING TO GIVE CONTROLLING WEIGHT TO DR. PARSA'S OPINIONS

In evaluating the claimant's residual functional capacity and alleged disability, the ALJ gave "little weight" to the opinions of the claimant's treating physician, Dr. Parsa, but gave "great weight" to the opinions of the non-examining state agency consultants.  The Social Security regulations and rulings explain how medical opinions are to be weighed.[95]  Generally, an ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record.  Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[96]  In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[97]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for

---

[95]    20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[96]    *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[97]    20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

doing so.[98]   Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[99]   Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[100]

Dr. Parsa authored a letter in May 2016, stating that the claimant was being treated for major depression and anxiety and "is unable to engage in gainful employment as she has had multiple depressive symptoms including insomnia, low energy and difficulty concentrating."[101]   It was proper for the ALJ to give little weight to this statement for two reasons.  First, the ALJ has sole responsibility for determining the claimant's disability status.[102]   Second, "[a] statement made by a treating physician that a claimant is disabled does not mean that the claimant is

---

[98]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[99]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

[100]    *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

[101]    Rec. Doc. 9-1 at 399.

[102]    *Newton v. Apfel*, 209 F.3d at 455.

disabled for purposes of the Social Security Act."[103]     Therefore, a physician's statement that a claimant is disabled or unable to work is not a medical opinion entitled to deference but a legal conclusion that is reserved to the Commissioner.[104] Accordingly, the ALJ did not err in giving the opinion little weight.

Dr. Parsa also filled out a functionality assessment in March 2016, in which he expressed several opinions concerning the claimant's mental impairments.  First, he stated that the claimant does not have bipolar syndrome.  This opinion is supported by the evidence in the record as a whole.  All of the instances in the record that mention the claimant being bipolar are based on the claimant's own contention that she received such a diagnosis when she was hospitalized following her suicide attempt.  But the record contains no treatment notes, hospital notes, physicians' statements, or any contemporary evidence whatsoever from her alleged hospital stay. Thus, the record does not contain an actual diagnosis of a bipolar condition.

Dr. Parsa then noted that the claimant has several symptoms of depressive syndrome, including anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and

---

[103]     *Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir. 1984).

[104]     *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (per curiam); see also 20 C.F.R. §§ 404.1527(d)(1), 404.1527(d)(3), 416.927(d)(1), 416.927(d)(3).

difficulty concentrating or thinking.  Dr. Parsa then indicated that the claimant has marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies in maintaining concentration, persistence, or pace; and four or more episodes of decompensation, each of extended duration.  The ALJ found that these opinions are "wholly inconsistent with the claimant's medical record" and unsupported by Dr. Parsa's own treatment notes.[105]  This Court agrees with the ALJ's evaluation.

The record contains no evidence of any period of decompensation.  Even when the claimant stopped taking her prescribed medications, there is no evidence that she required emergency medical treatment, hospitalization, or any type of intensive mental health treatment.  Dr. Parsa did not identify any periods of decompensation, and the record contains no evidence of any such events.  Therefore, his opinion in that regard is not entitled to great weight.

Dr. Parsa's opinion that the claimant has marked difficulties in the area of concentration, persistence, and pace, is also unsupported by the evidence in the record.  His treatment notes indicate that the claimant complained subjectively of difficulty concentrating but also indicate that her concentration was not tested.[106]  Therefore, the claimant's subjective complaint was not corroborated objectively, and

---

[105]    Rec. Doc. 9-1 at 27.

[106]    Rec. Doc. 9-1 at 339, 335, 333.

Dr. Parsa actually had no objective basis for finding that she had marked difficulties in this area of functionality. Therefore, his opinion in this regard is not entitled to great weight.

Although Dr. Parsa found that the claimant exhibited characteristics of a depression including constricted affect and depressed and anxious mood when he first saw her,[107] he also noted that the claimant's affect and mood improved after her first appointment with him. On two subsequent visits, her affect was appropriate and her mood was described as having benefited from prescribed medication.[108] Dr. Parsa consistently found that the claimant had a cooperative attitude, fair insight, fair judgment, unremarkable thought content, intact thought process, good memory, and no suicidal or homicidal ideation.[109] These findings are inconsistent with the level of functional impairment that Dr. Parsa assigned.

Furthermore, the record contains evidence that the claimant did not consistently take medication prescribed to treat her mental health conditions. In particular, she was taking no medication at all at the time of the hearing. The record also evidences gaps in the claimant's mental health treatment,[110] and the claimant

---

[107]    Rec. Doc. 9-1 at 338.

[108]    Rec. Doc. 9-1 at 335, 332.

[109]    Rec. Doc. 9-1 at 338-339, 335, 332-333.

[110]    Rec. Doc. 9-1 at 342.

failed to consistently engage in recommended mental health counseling.[111]  An ALJ may rely on lack of treatment as an indication of non-disability,[112] and a failure to follow prescribed medical treatment may preclude an award of benefits.[113] Therefore, a claimant's failure to comply with a medication and counseling regimen prescribed by her physician is critically important to understanding the extent to which an alleged impairment is actually disabling.  In this case, these factors are inconsistent with the level of functional impairment assigned by Dr. Parsa.

The ALJ found that Dr. Parsa's opinions regarding the effect of the claimant's depression on her functionality are not supported by the evidence in the record or, more particularly, on Dr. Parsa's own treatment notes.  There is substantial evidence in the record supporting the ALJ's conclusion in that regard.  Accordingly, this Court finds that the ALJ did not err in failing to give Dr. Parsa's opinions great weight.

### CONCLUSION AND RECOMMENDATION

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

---

[111]    Rec. Doc. 9-1 at 339, 340

[112]    *Doss v. Barnhart*, 137 Fed. App'x 689, 690 (5th Cir. 2005); *Villa v. Sullivan*, 895 F.2d at 1024.

[113]    20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[114]

Signed in Lafayette, Louisiana, this 29th day of June 2018.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[114]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).